## UNITED STATES *v.* FRIZZELL.

---

PENSIONS; INSANE AND INDIGENT PENSIONERS; GOVERNMENT HOSPITAL
FOR THE INSANE.

The proceeds of a pension granted by the United States to one formerly a soldier, but discharged from the military service for insanity occurring after his enlistment, cannot, at the suit of the United States, be charged with payment of board and medical service received by him while in confinement in the Government Hospital for the Insane after his discharge from the army.

No. 1115.    Submitted October 15, 1901.    Decided November 7, 1901.

HEARING on an appeal by the United States from an order of the Supreme Court of the District of Columbia holding

an equity court, discharging a rule to show cause why the proceeds of the pension of an insane pensioner, John H. Righter, in the custody of his committee should not be charged with the payment of his board and treatment at the Government Hospital for the Insane.          *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an appeal from an order of the Supreme Court of the District in the matter of the statement of an account in the equity branch of that court.

The cause was tried upon an agreed statement of facts, which is substantially as follows:

In March, 1878, one John H. Righter, named above, enlisted as a first-class private in the Signal Corps of the United States Army, and while serving therein became insane, and on or about May 2, 1882, was committed by order of the Secretary of War to the Government Hospital for the Insane, commonly known as St. Elizabeth's, where he remained until taken therefrom by his present committee, in January, 1896. In July, 1882, about two months after his commitment to the hospital, he was discharged from the military service by reason of insanity, which has continued to the present time.

By his first wife, who died in November, 1879, he had one son, Charles H. Righter, born in that year, who is still living, and who has been supported and educated by means of the pension granted by the United States to the said John H. Righter, the said John H. Righter being without any other property or means of support.

In December, 1880, said John H. Righter married Annie Sheperd, who is still living, and who, on February 28, 1884, in a suit whereof the present proceedings are a continuation, was appointed by the Supreme Court of the District, sitting in equity, as committee of the person and estate of the said John H. Righter. On July 6, 1886, in pursuance of a petition filed in the same suit, she was removed,

4

and the present committee, Emma J. Frizzell, who is a niece of the said lunatic, was appointed in her place.

On September 13, 1884, upon application of his first committee, a pension of fifty dollars a month, to date from July 8, 1882, was granted to said John H. Righter; and the same was subsequently increased to seventy-two dollars per month, to date from March 4, 1890, in pursuance of the provisions of the act of Congress of the last-mentioned date.

In May, 1895, while the lunatic was still in the Government Hospital for the Insane, his committee received a bill amounting to $1,389.28 for his board and medical treatment in that institution, at the rate of five dollars a week, from March 4, 1890, the date of his increased pension, to June 30, 1895, the last day of the fiscal year 1894–1895.

The committee, it seems, had filed several accounts of her trust; and now, on September 24, 1895, in order to procure an adjudication of the claim of the hospital, she filed another account, omitting all mention of this· claim, but showing savings and investments made by her for the benefit of the lunatic to the amount of $2,000, after payment for the support of his son and some incidental expenses. Thereupon the United States, by their attorney for this District, filed a petition in the cause for leave to intervene and for a rule on the committee to show cause why she should not be required to pay the claim of the hospital, then stated to be the sum of $2,220, being at the rate of five dollars a week from March 4, 1890, to October 4, 1898. Why the demand was made to extend to October 4, 1898, when, according to the agreed statement of facts, the lunatic had been removed from the hospital upwards of two years and eight months before, in January of 1896, is not made to appear. The answer of the committee to the petition denied her liability for the claim of the hospital, and averred that she had removed the lunatic from the institution in January of 1896, that she had since that time from his pension money paid for his board, clothing and treatment, first in a private family, then in an asylum in the State of Maryland; also that she had paid for the support, clothing and education

of his minor son; and, further, that, from the said pension money, she had saved and invested in real estate securities the sum of two thousand dollars, but that, apart from said funds, she had not sufficient money wherewith to pay the claim of the hospital.

The bill of the Government Hospital for the Insane, which is again stated in the agreed statement of facts to be $1,389.28, is unpaid.

Upon the petition and the answer of the committee thereto and the agreed statement of facts, the court below adjudged that the committee was not liable for the demand of the United States, and discharged the rule to show cause. And from the order of the court in the premises this appeal is prosecuted on behalf of the United States.

*Mr. Ashley M. Gould,* United States Attorney for the District of Columbia, and *Mr. Peyton Gordon,* Assistant United States Attorney, for the United States.

*Mr. S. R. Bond,* for the appellee.

Mr. Justice Morris delivered the opinion of the Court:

The question here is, whether the proceeds of a pension, granted by the United States to one formerly a soldier in the military service and discharged therefrom for insanity supervening after his enlistment, can be required by judicial process to be appropriated to the payment of the board and medical service received by the insane person while under confinement in the Government Hospital for the Insane after his discharge from the army.

The question is a novel one. There seems to be no precedent for it; and its solution must depend, not so much upon general principles of law, as upon a reasonable consideration and construction of the scope and purpose of the statutes of the United States relative to the Government Hospital for the Insane and to the subject of pensions.

There is presented to us an elaborate and ingenious argument on behalf of the appellant to show that the enlistment

of a soldier in the military service establishes for him a
status analogous to the status established by the contract of
marriage, and with similar and analogous incidents; that,
by the discharge of the lunatic in this case from the military
service on the ground of his insanity, his status as a soldier
ceased, and he was not thereafter entitled to receive board
and medical treatment at the Government Hospital for the
Insane, except upon the same terms and conditions as
patients authorized to be received therein upon payment for
such services, unless he was indigent, and that the lunatic
in this case was not indigent, inasmuch as he was in receipt
of a pension of $72 a month from the United States.  Un-
doubtedly it must be conceded that the first proposition here
stated is correct.  The enlistment of a person as a soldier
in the army of the United States creates a status for such
person, with certain appropriate incidents, like any other
status, whether founded upon contract or otherwise; and it
is true that such status, with its ordinary incidents, is ter-
minated by the discharge of the person from the military
service.  But it does not follow from this that a lunatic
soldier, committed to the Government Hospital for the In-
sane during the term of his contract of enlistment, ceases
to be entitled to the benefit of the institution upon his dis-
charge from the military service on the ground of his in-
sanity and his consequent disability further to perform the
service.  On the contrary, the statute which authorized his
commitment, which is section 4843 of the Revised Statutes
of the United States, taken from the act of Congress of
March 3, 1855 (10 Stat. 682), distinctly forbids any such
conclusion.  For it provides —

"The superintendent [of the hospital] upon the order
of the Secretary of War, of the Secretary of the Navy, and
of the Secretary of the Treasury respectively, shall receive
and keep in custody until they are cured or removed by
the same authority which ordered their reception, insane
persons of the following descriptions:

"First. Insane persons belonging to the Army, Navy,
Marine Corps, and revenue cutter service.

" Second. Civilians employed in the Quartermaster's and Subsistence Departments of the Army, who may be, or may hereafter become insane while in such employment.

" Third. Men who, while in the service of the United States, in the Army, Navy, or Marine Corps, have been admitted to the hospital and have been thereafter discharged from it on the supposition that they have recovered their reason and have, within three years after such discharge, become again insane from causes existing at the time of such discharge, and have no adequate means of support.

" Fourth. Indigent insane persons who have been in either of the said services and been discharged therefrom on account of disability arising from such insanity.

" Fifth. Indigent insane persons who have become insane within three years after their discharge from such service, from causes which arose during and were produced by said service."

From this statute itself it seems to us to be quite clear that it was not the intention of Congress that the discharge of an insane soldier from the military service on the ground of his insanity, made after his commitment to the hospital, should of itself operate to authorize his discharge from the hospital. The statute provides that the patient shall not only be received, but likewise kept in custody *until he is cured, or until he is removed by the same authority which ordered his reception;* and it gives no authority to the superintendent to discharge him for the reason that by his intermediate discharge from the army, he has ceased to be a soldier of the United States. The whole tenor and purpose of the statute show that no such contingency was contemplated by Congress. For the purpose of the act is not to be measured by any rigid application of the law relating to contracts, or even of the laws relative to status. The purpose of the act was the dictate of humanity to provide for the helpless and the afflicted. It is the well-established rule of every intelligent system of law, that it is the duty of the State, as best it can, to protect and provide for those who, by reason of mental immaturity or mental imbecility,

are unable to protect themselves. And hence it establishes
orphan asylums and hospitals for the insane, or encourages
their establishment by private benevolence. The State like-
wise is justified in adopting all appropriate methods to se-
cure the efficiency of its military service; and when a person
received by it into that service becomes insane, a double
duty is imposed upon it to provide for such person. As-
suredly it cannot be that the law of humanity in that regard
is satisfied by the commitment of the afflicted person to the
insane asylum and his immediate discharge therefrom on
the ground that the status of soldier, which justified his
commitment, has ceased by reason of the very disability
which alone gave occasion for the commitment.

The State needs soldiers. It needs to keep its army in
an efficient condition. It needs to keep the ranks of the
army filled. When a soldier becomes insane, he is no longer
able to perform the duty which he assumed; and his dis-
ability in many cases, perhaps in most cases, is likely to
be permanent. Immediately, as soon as the disability super-
venes, the State may properly discharge the person, and
receive another in his place. Now, it would be an absurdity,
to assume that it was the intention of Congress to measure
the period of his detention in the hospital under his com-
mitment by the length of time which should elapse between
the commitment and his discharge from the army. These
two things, in fact, might well be simultaneous. We take
it that the purpose and plain intent of the act of Congress
were that any person in the military service of the United
States becoming insane might be committed to the hospital
during his term of service, and thereafter detained there
at the expense of the United States, until he was cured or
was removed by the same authority which committed him,
notwithstanding that in the meantime he ceased to be in
such military service. And this conclusion is strengthened
by the provisions of the act in reference to the admission
of persons to the hospital after they have ceased to be in
the military service, provided their insanity has been super-
induced by causes originating in the service, although in

this class of cases there must be the additional prerequisite of indigence to justify the commitment and detention. The substance of the whole act is that the Government of the United States will provide, in its Hospital for the Insane, and will continue therein to provide for its insane soldiers, as well as for those who have ceased to be soldiers, when the insanity or the cause of insanity has arisen in the course of the military service; and that such provision is to continue indefinitely until the person is cured or removed by the authority which committed him.

Now, if this is the conclusion to be drawn from the statute — and we have no doubt in regard to it — it follows, as of course, that the superintendent of the hospital would have no right to discharge the lunatic in this case from his custody at the hospital on the grounds of his discharge from the military service subsequently to the commitment. It is true that no such right or authority in the superintendent is claimed on behalf of the appellant here; but the existence of such right or authority would be the necessary consequence of the right which is claimed for the superintendent to change the status of the insane person from that of a patient without charge to that of a pay patient. If the one authority is not warranted by law, the other cannot be; for the latter necessarily involves the former. There may be circumstances, even under existing law, which would justify the exercise of both, not by the superintendent, but by the Secretary of War. Soldiers are generally more or less indigent and impecunious. But if an insane soldier happened to be a man of wealth or of private resources of his own, or if, being impecunious at the time of his enlistment and at the time of the occurrence of his affliction, he should thereafter by gift or inheritance become the owner of wealth or the possessor of a competent estate, we find nothing in the law which would preclude the Secretary of War from ordering his discharge, unless the committee of his estate should agree to pay the expense of his maintenance. But this power of discharge, and indirectly the power thus to compel the payment of expenses, is vested in the Secretary

of War, if anywhere, and not in the superintendent of the hospital.

Inasmuch, therefore, as the commitment of the patient in this case was without charge to him, and was to continue, and to continue on the same terms, until he should be cured, or removed by the authority of the Secretary of War, and he was never cured, and was never removed by the authority of the Secretary of War, or at all events was not removed until after the expiration of the period for which the charge is here sought to be made, we fail to see wherein there was any authority for the superintendent of the hospital to make such charge.

2. But it is argued that the charge is authorized by other legislation of Congress. And in this connection the part of the statute is insisted on which provides for the commitment to the hospital of persons who have been discharged from the army on account of disability arising from insanity, or who, having been discharged, afterward within three years become insane. The provision in reference to this class of persons is that they must also be indigent in order to be entitled to admission. And it is urged that the lunatic in the case before us was not indigent, inasmuch as he was in the receipt of a pension of $72 a month, which was more than sufficient to pay his expenses at the hospital.

In answer to this proposition it may be sufficient to say that, in our opinion, it has no application to the case before us. The indigent persons, who are thus authorized to be admitted into the institution, are persons who have already been discharged from the army, and not those who are committed while yet in the army. We cannot suppose two commitments in this case — one actual, while the person was actually in the military service of the United States, and the other constructive, after the person was discharged. We find no warrant in the law for any such technical subdivision of the action of the Secretary of War; and even if we did, we fail to see wherein it would help the cause of the appellant. For, if we were to assume that, after the discharge of the lunatic from the army, there was in contemplation of

law a new commitment of him to the hospital as an indigent insane discharged soldier under either the fourth or fifth clause of the act, that commitment of him was never changed by the Secretary of War, and it was for the Secretary, and not for the superintendent of the hospital, to determine that circumstances had arisen which justified an alteration of it. Again, it appears from the statute (Revised Statutes, Secs. 4849, 4854) that pay patients, as they are called, are not authorized to be kept in the institution except upon the order of the Secretary of the Interior, or upon the certificate of two respectable physicians. At least, such was the law during the time of the commitment and confinement of the lunatic in this case. The Secretary of War has nothing to do with the commitment of pay patients to the hospital, and no pay patient could be held upon his commitment. It necessarily follows that, upon his commitment, no person could be transferred from the class of patients maintained without charge to the class of pay patients.

We do not think that the fact that this insane person receives a pension of $72 from the United States at all affects the question in issue, which is the question of his liability to be charged as a pay patient on the ground that he is not indigent. The legislation in regard to pensions is peculiar. Pensions are a bounty from the Government, intended, in consideration of the dangerous character of the military service, as a means of support for disabled soldiers, their wives and minor children, after the service has ceased. They may sometimes be bestowed undeservedly; but the underlying purpose of the legislation on the subject is a humane one. In furtherance of this purpose it has been sought to secure the benefit of the pension to the pensioner himself and his family, as far as it has been found possible by Congress so to secure it; and for this reason it has been specifically enacted that an " accrued pension shall not be considered as part of the assets of the estate of deceased pensioner, nor liable to be applied to the payment of the debts of said estate in any case whatever, but shall inure to the sole and exclusive benefit of the widow or children." Revised Statutes, Sec. 4718. It

cannot be withheld even in satisfaction of arrears due from the pensioner to the United States, if any there are. Revised Statutes, Sec. 4734. And it must be paid directly to the pensioner himself, and to no agent, attorney, or other person on his account, except that it may be paid to the guardians of persons laboring under legal disability, or, in the case of an insane pensioner, to his wife or the guardian of his dependent children. Act of Congress of August 8, 1882, 22 Stat. 373. And it is further provided that " no sum of money due or to become due to any pensioner shall be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, whether the same remains with the Pension Office, or any officer or agent thereof, or is in course of transmission to the pensioner entitled thereto, but shall inure wholly to the benefit of such pensioner." Revised Statutes, Sec. 4747.

Of course, the protection sought to be extended by the legislation of Congress to pension money ceases when the money has actually come into the possession of the pensioner, or of the person to whom, in case of his disability, it is payable for him. And yet the policy of several of the States of the Union has been to extend the exemption of such money and of its proceeds, when invested, from the ordinary liabilities of other property. See *Perkins* v. *Hinckley,* 71 Iowa, 499; *Stockwell* v. *National Bank of Malone,* 36 Hun (N. Y.), 583; *Yates County National Bank* v. *Carpenter,* 23 N. E. Rep. (N. Y.) 1108; *Hissem* v. *Johnson,* 27 W. Va. 644. In the case last cited of *Hissem* v. *Johnson,* apparently without any special statute for the purpose, the Court of Appeals of West Virginia held that land purchased for the use of the wife of a pensioner, with the proceeds of pension drafts, was not liable for the payment of a judgment against the pensioner. These cases are cited, not as authority for that now before us, but to show the public policy that controls in the grant of pensions by the Government of the United States.

Now, when the policy of the Government, and its legislation, so far as it has been possible to legislate, is to secure the receipt of pension money by the pensioner himself, or his

duly appointed guardian or committee, or his wife or dependent children, and to provide that it should not be subject to the payment of debts, and that it should not be subject to be detained by the Government itself for its own claims against the pensioner, it is difficult not to find absurdity in the position which would absolutely secure payment of the money to the pensioner, yet would immediately take it back again to another department of the Government in satisfaction of a claim of such department against him. What difference there is in principle or in effect between retaining pension money to pay arrears and seeking to enforce the payment of arrears out of pension money paid, we are unable to see. That the latter is the present case, is quite plain; for, as between the Government of the United States and this pensioner or his committee or his estate, it is of no consequence that the pension money received has been invested in a mortgage; it remains, in contemplation of Federal law, pension money; and, as invested, it serves the purpose for which it was granted by the United States. If the Government cannot reclaim the pension money for debts due to itself, it cannot reclaim the proceeds of its investment; and a judgment against the lunatic in the present case, or what amounts to the same thing, an order on his committee to pay the demand of the hospital, would be payable out of his pension money.

Legislation by Congress upon analogous matters tends to support the conclusion here reached.

It is provided, for example, that inmates of the Soldiers' Home, who become insane, may be transferred to the Hospital for the Insane (act of Congress of July 7, 1884, 23 Stat. 194), and that the expense of their maintenance at the hospital shall be paid out of the Soldiers' Home fund. But there is no requirement that they shall surrender their pensions, if such they receive, either for their maintenance in the home or in the hospital, unless indeed they be such as have not contributed from their monthly compensation to the support of the home. The provision in that regard is this:

" The fact that one to whom a pension has been granted for wounds or disability received in the military service has

not contributed to the funds of the Soldiers' Home shall not preclude him from admission thereto; but all such pensioners shall surrender their pensions to the Soldiers' Home during the time they remain therein and voluntarily receive its benefits."

So that it appears that the soldier of the regular army, like the lunatic in the present case, who has contributed out of his monthly pay to the funds of the Soldiers' Home, and who has received a pension for disability, is entitled to admission into the home and transfer therefrom to the hospital without surrender of his pension, which remains for his wife and dependent children.

Likewise it has been enacted that volunteer soldiers, inmates of the National Home for disabled volunteer soldiers, becoming insane, may. be transferred to the Government Hospital for the Insane; and that their pensions, if they receive any, which they are required in the first instance to assign to the home, shall thereupon be assigned and transferred to the hospital. (Act of Congress of August 2, 1882, 22 Stat. 302.) But it is with the provision that the transfer shall only be for the time they are in the home or hospital, and that there is neither wife, nor minor child, nor dependent parent. The volunteer soldier has not, like the soldier of the regular army, by his monthly contributions, earned the right to residence in the home or to transfer therefrom to the hospital; and hence he is required for the time being to assign his pension, if one he has, and there is no one dependent upon him for whom he should provide. The reservation for the benefit of wife, children and parents, and the absence of any provision whatever for the transfer of pension in the case of the soldier of the regular army who has contributed to the support of the home, are sufficient to show that Congress did not intend, in a case like the present, to make a pension directly or indirectly liable for the maintenance of the insane pensioner at the Government Hospital for the Insane.

The pension in the present case was probably ample enough both for the maintenance of the insane person himself and that of his minor son and wife and there might have

been equity in the application of part of it to the support of the lunatic himself at the hospital. But in view of the legislation of Congress on the subject, we do not see how such application of the money can be judicially enforced.

We are of opinion that the court below was right in the order which it made rejecting the claim of the Government Hospital for the Insane, and that such order should be *affirmed. And it is so ordered.*